## United States Bankruptcy Court, Northern District of Illinois

| Name of Assigned Judge | Manuel Barbosa | **CASE NO.** | 09-B-71797 |
|---|---|---|---|
| **DATE** | December 13, 2010 | **ADVERSARY NO.** | 09-A-96176 |
| **CASE TITLE** | Michael J. Zahniser, Debtor<br><br>Byron Bank, Plaintiff<br><br>v.<br><br>Michael J. Zahniser, Defendant. | | |

**DOCKET ENTRY TEXT**

For the reasons set forth below, the Court finds that $50,000 of the Bank's deficiency claim, together with $19,691.81 in costs and attorneys' fees shall be non-dischargeable under Section 523(a)(6).

■[ For further details see text below.]

The matter is before the Court on the Plaintiff's adversary complaint to determine a debt to be non-dischargeable under Section 523(a)(6) of the Bankruptcy Code. The Court held a trial on November 16, 2010, at which the Debtor/Defendant did not appear, but at which the Plaintiff presented evidence. For the reasons set forth below, the Court will grant judgment in favor of the Plaintiff, finding that an amount of $50,000 owed by the Debtor to Byron Bank, together with $19,691.81 in attorneys' fees shall be non-dischargeable.

**Factual Background**

The Plaintiff, Byron Bank, extended the Debtor/Defendant a loan in the amount of $165,000 on March 28, 2007, for the purchase of a home at 2759 English Lane, Winnebago, Rockford. The Defendant purchased the home with the loan proceeds, and the loan was secured by a mortgage in the property. The purchase price for the home was $165,000, though because it was purchased out of foreclosure, the Bank estimated it had a fair market value of closer to $209,000 at the time. The Defendant made numerous improvements to the house, including installing cherry cabinets, granite countertops and tiling in the kitchen. The Bank extended an additional $20,465.75 on August 17, 2007 for the improvements, which was also secured by a mortgage in the property, and it was unclear if the Debtor also funded any of the improvements with his own money.

Both the original loan and the additional loan were short-term, with terms of less than three months, and had interest-only payments with the full principal coming due at the maturity date. The original intent was that the short-term loans would be replaced with long-term financing at some point, but that never happened. In each case, the loans were extended several times, but were ultimately extended only through April 15, 2008.

After the Defendant failed to repay or refinance the mortgage loans at their final maturity in April 2008, the Bank sent out a demand letter on June 21, 2008. The Debtor obtained permission from the Bank to list the house for sale, and he listed it for $259,900 in the summer of 2008, but was unable to sell it. In July 2008, an officer of the Bank inspected the house. The improvements were complete as of July 2008, and the property was in good condition, other than some overgrowth in the landscaping. After the house failed to sell during the summer, the Bank filed a foreclosure proceeding in October 2008, and served the Defendant with a summons on October 21, 2008. On October 28, 2008, the Bank received a telephone call from the realtor for the property, and was informed that the back door of the house was missing and that numerous items had been removed from the interior. An officer of the Bank returned to the house on October 29, 2008, and found that, not only the backdoor was missing, but the whole interior of the house had been stripped. The damage was more than the mere removal of movable personal property. The house had been completely gutted. The countertop and cabinets had been removed, as well as the tiling in the kitchen. The air conditioner had been removed, and even the light fixtures, the side garage door and some of the siding and gutters were gone. In his Answer to the Complaint, the Defendant admitted that he had removed numerous items on or about October 22, 2008, though he claimed that the damage was "not to the extent claimed by Byron Bank." However, Byron presented testimony of the bank officer who visited the property as to the extent of the damage, as well as photographs and the testimony of an appraiser.

The appraiser hired by the Bank appraised the property as of March 13, 2009, as having a market value of $115,000. He reached this value by comparing against sales of property of similar size sold within the previous year, and then adjusting for the condition of the house. He determined that the house was not in a habitable or saleable condition because of the damage done to it. The appraiser estimated that it would cost between $35,000 and $40,000 to remodel the house back to a habitable condition. However, he noted that this estimate was based on average furnishings, and noted that the house had been previously furnished with

premium furnishings, such as cherry cabinets and granite countertops. The comparable sales had been for between $130,000 and $145,000 in late 2008 or early 2009, in each case selling out of foreclosure.

The Bank proceeded with the foreclosure, and purchased the property at the foreclosure sale for $135,000 on April 22, 2009. They had also received a judgment in the foreclosure action in the amount of $220,639.86, including interest and costs of sale, leaving a deficiency of $85,639.86. The Defendant filed a petition for bankruptcy protection under Chapter 7 with this Court on April 30, 2009. The Bank filed a proof of claim for its deficiency judgment of $85,639.86, and ultimately received only a distribution of $2,898.48 according to the Trustee's Final Report.

## Discussion

Section 523(a)(6) provides that: "(a) A discharge under section 727 . . . does not discharge an individual debtor from any debt- . . . . (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). To determine the nondischargeability of a debt under section 523(a)(6), a creditor must prove three elements by a preponderance of the evidence: (1) the debtor intended to and caused an injury to the creditor's property interest; (2) the debtor's actions were willful; and (3) the debtor's actions were malicious. Mut. Mgmt. Servs., Inc. v. Fairgrieves (In re Fairgrieves), 426 B.R. 748, 756 (Bankr. N.D. Ill. Jan. 25, 2010). The requirements of "willfulness" and "maliciousness" are distinct requirements in the statutory text and are usually treated as such by the courts. Id.

"The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Id. at 756-57 (quoting Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998)). Under Geiger and its stringent standards, to satisfy the requirements of § 523(a)(6), a creditor must plead and prove that the debtor actually intended to harm him and not merely that the debtor acted intentionally and he was thus harmed. Id. at 757 (citing Geiger, 523 U.S. at 61-62). Thus, the debtor must have intended the tortious consequences of his act. Id. (citing Geiger, 523 U.S. at 61-62; Berkson v. Gulevsky (In re Gulevsky), 362 F.3d 961, 964 (7th Cir. 2004)). Injuries either negligently or recklessly inflicted do not come within the scope of § 523(a)(6). Id. (citing Geiger, 523 U.S. at 64).

The Supreme Court did not define the scope of the term "intent" utilized to describe willful conduct. Subsequent decisions, however, have found that either a showing of subjective intent to injure the creditor or a showing of a debtor's subjective knowledge that injury is substantially certain to result from his acts can establish the requisite intent required by Geiger. Fairgrieves, 426 B.R. at 756. Because a person will rarely admit to acting in a willful and malicious manner, those requirements must be inferred from the circumstances surrounding the injury. Id.

An act is "malicious" if it is taken "in conscious disregard of one's duties or without just cause or excuse. . . ." Fairgrieves, 426 B.R. at 757 (internal citation omitted). The test for maliciousness under § 523(a)(6) is (1) a wrongful act, (2) done intentionally, (3) which causes injury to the creditor, and (4) is done without just cause and excuse. Id. A debtor does not have to act with ill will or a specific intent to do harm to the creditor for the conduct to be malicious. Id.

"Injury" means the violation of another's legal right or the infliction of an actionable wrong. Fairgrieves, 426 B.R. at 757. Injuries covered under section 523(a)(6) are not confined to physical damage or destruction; an injury to intangible personal or property rights is sufficient. Id. A fraudulent transfer involving actual fraud, or a willful and malicious destruction of collateral securing a creditor's debt can constitute an "injury" for purposes of Section 523(a)(6). Id. at 758; see also, McClellan v. Cantrell, 217 F.3d 890, 898 (7th Cir. 2000) (Ripple, J. concurring) (noting that Illinois law, the creation of a security interest gives a creditor an interest in property, and that by wrongfully disposing of collateral, a debtor could cause injury to a secured creditor by "prevent[ing] him from collecting on the debt he was owed."). A creditor can therefore demonstrate a willful and malicious injury to property where he presents "proof that the debtor intended to improperly dispose of the creditor's collateral and used the proceeds for purposes other than payment of the secured debt" and that the debtor "intended to harm the secured creditor or was aware that the creditor would be harmed by his actions." Farmers State Bank v. Simpson (In re Simpson), 08-A-8119, 2010 WL 1521309 at *2 (Bankr. C.D. Ill. Apr. 14, 2010). Therefore, proof of conversion is not enough, the creditor must also prove "an intent to do harm or cause injury." Koplin v. Ginsberg (In re Ginsberg), No 09-A-188, 2009 WL 2166688 at *4 (Bankr. N.D. Ill. July 15, 2009) (Hollis, J.).

Pursuant to the mortgage that the Debtor signed, he covenanted that "No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property." The mortgage also provided that the Debtor was required to pay the Bank's expenses, including attorneys' fees, court costs and other legal expenses, if the Debtor breached the agreement. "Property" was defined in the mortgage to include the real estate as well as "all existing and future improvements, structures, fixtures and replacements." The Plaintiff provided testimony from the Bank's officers that the Bank never consented to the removal of the property that the Debtor removed on or about October 22, 2008. Additionally, based on the types of property removed, the Debtor could have had no misunderstanding that he had a right to remove the property at issue, which were clearly fixtures. This was not a matter of removing a dishwasher, refrigerator or stove, which he might have plausibly thought were not included as part of the house. He removed cabinets, countertops, doors, light fixtures, gutters, pieces of siding and tile floors. He had to cause severe damage to the structure of the building to remove the property, and left a gaping hole one of the walls, exposing the inside of the house to the elements. He apparently even tried to remove part of the fireplace and mantel before giving up.

The Plaintiff also provided ample proof that the Debtor specifically intended to harm the Bank and its ability to be repaid on the loan. He gutted the house the day after he was served with a summons for the foreclosure action. Moreover, the items he took and the state in which he left the house demonstrate he was not merely trying collect what would be valuable for himself – but rather that he was trying to deny value to the Bank. Again, he did not just take appliances; he stripped the floor, and removed siding, doors and gutters. It is doubtful that used tiles, scraps of siding or pieces of a deck would be of much value to the Debtor, but removing and destroying them would significantly decrease the value and saleability of the house. He left the house with

no door and a gaping hole in the wall. The Plaintiff therefore has proven that the Debtor intended to cause injury to the Bank's interest in the house, and that he acted willfully and maliciously.

However, the Court does not agree with the Bank's argument as to the extent of the injury and damages. The Bank argues that the full deficiency judgment should be held nondischargeable. However, Section 523(a)(6) only makes non-dischargeable the debt in respect of the "injury" caused by the Debtor's willful and malicious acts. The "debt" for purposes of Section 523(a)(6) "is not the underlying contract ... but an amount equal to the injury caused by the debtor. In other words, the debt (plaintiff's damages) is the value of the collateral denied it by the debtor's wrongful actions." Commerce Title Co. v. Olson, No. 97-C-3950, 1998 WL 88892, at *2 (N.D. Ill. Feb. 12, 1998) (citing In re Modicue, 926 F.2d 452, 453 (5th Cir. 1991)); see also Staley Employees Credit Union v. Hardy (In re Hardy), Nos. 98-70016, 98-7073, 1999 WL 33592906, at *3 (Bankr. C.D. Ill. June 21, 1999) (finding that, where debtor removed and sold parts from a motorcycle constituting collateral, the "measurement of damages is the difference between the value of the motorcycle before and after the parts were removed"). Here, at least a portion of the change in value was caused not by the Debtor's acts alone, but by the change in the real estate market. The Plaintiff presented an appraisal from July 2007 which valued the property at $250,000, but that appraisal used comparative sales that were open market sales, and specifically noted that it did not consider the March 2007 purchase price of $165,000 because it was from a foreclosure sale. In contrast, the March 2009 appraisal, which valued the property at $115,000, used comparative sales that were foreclosure sales, and *did* take into consideration the March 2007 foreclosure purchase price. Moreover, the March 2009 appraisal noted that the real estate market had deteriorated within the prior two years, noting that in 2007 the market was just "starting to get worse" and that by 2009 there "are many more northeast Rockford properties for sale coming out of foreclosure" and "the market conditions are worse." Therefore, at least a part of the decrease in value to the March 2009 appraisal and the April 2009 sale was because of changes in the market and because the property was sold out of foreclosure rather than on the open market with time for marketing. Therefore, the Court instead focuses on the appraiser's testimony that it would cost between $35,000 and $40,000 to rehabilitate the house back to a habitable condition, and the testimony presented that the materials used in the original renovations were above average. The only evidence on value of the original renovations is that the Debtor borrowed $20,000 to fund them. If it would cost $35,000 to $40,000 to refurbish the house with 'standard' furnishings, and an additional $20,000 to replace some of those standard furnishings with 'premium' furnishings, then the Court will estimate that it would cost $50,000 to initially refurbish the house with the premium furnishings. The Court therefore finds that the Debtor's willful and malicious acts injured the Bank by $50,000, and the remainder of the deficiency was caused by the market and the nature of foreclosure.

### Conclusion

The Court therefore finds that $50,000 of the Bank's deficiency claim, together with $19,691.81 in costs and attorneys' fees shall be non-dischargeable under Section 523(a)(6).

    The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

December 13, 2010

                                                Judge Manuel Barbosa